## EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Appellant,

v.

## ARAMARK CORPORATION, INC., Appellee.

### Nos. 99–5125 & 99–7042.

United States Court of Appeals, District of Columbia Circuit.

Argued Jan. 13, 2000.

Decided April 14, 2000.

Barbara L. Sloan, Attorney, Equal Employment Opportunity Commission, argued the cause for appellant. With her on the briefs was Philip B. Sklover, Associate General Counsel.

Leslie Robert Stellman argued the cause and filed the brief for appellant Rebecca L. Fennell.

Ronald S. Honberg was on the brief for amicus curiae The National Alliance for the Mentally Ill.

Ronald S. Cooper argued the cause and filed the briefs for appellees Aramark Corporation, Inc. and Aetna Life Insurance Company.

Phillip E. Stano was on the brief for amici curiae the Health Insurance Association of America, the Equal Employment Advisory Council, the Chamber of Commerce of the United States of America and the American Council of Life Insurance.

Before: WILLIAMS, RANDOLPH and TATEL, Circuit Judges.

Opinion for the Court filed by Circuit Judge TATEL.

TATEL, Circuit Judge:

Claiming a violation of the Americans with Disabilities Act, appellants challenge an employee benefit plan that provides twenty-four months of long-term disability benefits for persons suffering from mental or psychological disabilities but a longer period of benefits for those with physical disabilities. Because the employer adopted the plan prior to the ADA's enactment and because circuit precedent holds that such plans are protected by the statute's "safe harbor" provision, we affirm the district court's grant of summary judgment for the employer and plan administrator.

I

Appellant Rebecca Fennell worked as a food service manager for appellee Aramark Corporation for ten years until mental illness prevented her from performing her duties. Following Fennell's extended leave of absence due to depression and post-traumatic stress disorder, Aramark terminated her employment on February 15, 1996. She received Social Security disability benefits and long-term disability payments under Aramark's employee benefit plan, administered by appellee Aetna Life Insurance Company. The plan provides income replacement amounting to two-thirds of base monthly salary for employees unable to work due to long-term disability resulting from illness, injury, or disease. Funded by contributions from Aramark and participating employees, the plan limits disability payments to twenty-four months if the disability is caused by a mental condition but continues payments until at least age sixty-five if the disability is physical. In accordance with the plan's terms, Aetna notified Fennell that because she had no physical impairment, her benefit payments would be discontinued effective April 16, 1997, two years after she began receiving them.

Alleging that the plan's different benefit terms for mental and physical disabilities amount to discrimination prohibited by the Americans with Disabilities Act, Fennell filed a complaint with the Equal Employment Opportunity Commission and then filed suit against Aramark and Aetna in the United States District Court for the District of Columbia. Three days later, EEOC also filed suit, and the two cases were consolidated. Fennell claimed that the cutoff in benefit payments violates Title III of the ADA, 42 U.S.C. §§ 12181–89, which prohibits discrimination "on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation...." *Id.* § 12182(a). EEOC argued that the two-year limit violates Title I of the ADA, *Id.* § 12111–17, which prohibits a covered employer from discriminating "against a qualified individual with a disability because of the disability of such individual in regard to [the] terms, conditions, and privileges of employment." *Id.* § 12112(a).

The district court granted summary judgment for Aramark and Aetna. *See Fennell v. Aetna Life Ins. Co.*, 37 F.Supp.2d 40 (D.D.C.1999). With respect to EEOC's claim, the district court observed that Title I protects only a "qualified individual with a disability," defined as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). Because Fennell had become totally disabled and unable to perform the essential functions of her job, the district court held

that she no longer met the definition of a "qualified individual with a disability" and was therefore unprotected by Title I of the ADA. *Fennell,* 37 F.Supp.2d at 43–44. With respect to Fennell's claim, the district court held that Title III only requires elimination of barriers to access for the disabled in places of public accommodation, which the court limited to "physical locations." *Id.* at 45. Because a disability benefit plan does not constitute a physical place of public accommodation, the court said, it is not regulated by Title III.

EEOC and Fennell appeal. EEOC argues that the district court erred by construing Title I narrowly to prevent former employees no longer able to perform the essential functions of their previous jobs from ever suing under the ADA. According to EEOC, the district court's ruling would prevent a totally disabled former employee from suing for discrimination in post-employment benefits, even if those benefits had been earned when she was a "qualified individual with a disability." Fennell argues that public accommodation refers not just to physical locations, as the district court held, but also to all available products and services including benefit plans. Our review is de novo. *See Cones v. Shalala,* 199 F.3d 512, 516 (D.C.Cir. 2000).

## II

Our sister circuits are divided on both issues that formed the basis of the district court's grant of summary judgment for Aramark and Aetna. The Seventh, Ninth, and Eleventh Circuits have held (as did the district court) that Title I of the ADA provides no protection to a totally disabled former employee because that person is no longer a "qualified individual with a disability." *See Weyer v. Twentieth Century Fox Film Corp.,* 198 F.3d 1104, 1110 (9th Cir.2000); *EEOC v. CNA Ins. Cos.,* 96 F.3d 1039, 1045 (7th Cir.1996); *Gonzales v. Garner Food Services, Inc.,* 89 F.3d 1523, 1531 (11th Cir.1996). Reaching the opposite conclusion, the Second and Third Cir-

cuits have held that a former employee who had earned fringe benefits while employed and "qualified" could sue under Title I for discrimination in post-employment benefits despite the fact that at the time of the suit the former employee had become completely disabled and no longer "qualified." *See Ford v. Schering–Plough Corp.,* 145 F.3d 601, 608 (3d Cir.1998), *cert. denied,* 525 U.S. 1093, 119 S.Ct. 850, 142 L.Ed.2d 704 (1999); *Castellano v. City of New York,* 142 F.3d 58, 68 (2d Cir.1998), *cert. denied,* 525 U.S. 820, 119 S.Ct. 60, 142 L.Ed.2d 47 (1998). With respect to Title III, the Third and Sixth Circuits (like the district court) have limited Title III to ensuring access to physical locations open to the public. *See Ford,* 145 F.3d at 614; *Parker v. Metropolitan Life Ins. Co.,* 121 F.3d 1006, 1014 (6th Cir.1997) (*en banc*), *cert. denied,* 522 U.S. 1084, 118 S.Ct. 871, 139 L.Ed.2d 768 (1998). The First and Second Circuits have held that the ADA's prohibition on disability discrimination in the products and services of places of public accommodation is not limited to physical structures and may in some instances include insurance policies and underwriting practices. *See Pallozzi v. Allstate Life Ins. Co.,* 198 F.3d 28 (2d Cir.1999), *amended on denial of reh'g,* 204 F.3d 392 (2d Cir.2000); *Carparts Distrib. Ctr., Inc. v. Automotive Wholesaler's Ass'n of New England, Inc.,* 37 F.3d 12, 19 (1st Cir. 1994).

■ This circuit has expressed itself on neither of these disputed issues, nor need we do so now, for we have circuit precedent under which we may affirm the district court on a different ground—that the challenged plan is protected by the ADA's safe harbor for bona fide employee benefit plans. Although the district court never addressed the safe harbor provision, the issue is fully briefed, and because we review the district court's judgment, not its reasoning, we may affirm on any ground properly raised. *See, e.g., Doe v. Gates,* 981 F.2d 1316, 1321–22 (D.C.Cir.1993).

The ADA's safe harbor appears in section 501(c): "Subchapters I through III of this chapter and title IV of this Act shall not be construed to prohibit or restrict ... a person or organization covered by this chapter from establishing, sponsoring, observing or administering the terms of a bona fide benefit plan that is not subject to State laws that regulate insurance." 42 U.S.C. § 12201(c)(3). This safe harbor "shall not be used as a subterfuge to evade the purposes" of Title I or Title III of the ADA. *Id.* § 12201(c).

■ The parties agree that Aramark's benefit plan "is bona fide in that it exists and pays benefits." *Public Employees Retirement Sys. of Ohio v. Betts,* 492 U.S. 158, 166, 109 S.Ct. 2854, 106 L.Ed.2d 134 (1989) (internal quotation marks omitted). They also agree the plan is not subject to state insurance regulation by virtue of ERISA's preemption provisions. Their disagreement centers on the meaning of the safe harbor's "subterfuge" exception. Relying on our decision in *Modderno v. King,* 82 F.3d 1059 (D.C.Cir.1996), Aramark and Aetna argue that their benefit plan cannot fall into the subterfuge exception because Aramark adopted it before the ADA's enactment. Fennell and EEOC contend that any benefit plan that includes disability-based distinctions, no matter when adopted, is a subterfuge if those distinctions are not "based on sound actuarial principles."

*Modderno* involved a challenge to a benefit plan's lifetime limit on mental health treatment reimbursement. Although the case arose under the Rehabilitation Act of 1973, which prohibits disability discrimination in government employment, that Act incorporates the ADA's safe harbor provision. *See* 29 U.S.C. § 794(d). The appellant in *Modderno* argued, as do Fennell and EEOC, that in order to escape the safe harbor's subterfuge exception, the employer had to show that any differential treatment of disabled persons in a benefit plan is actuarially justified. *Modderno* rejected this actuarial defense interpretation

of subterfuge, finding it " 'at odds with the plain language of the statute itself.' " *Modderno,* 82 F.3d at 1065 (quoting *Betts,* 492 U.S at 171, 109 S.Ct. 2854).

Of particular significance to this case, *Modderno* went on to hold that the plan challenged in that case could not be a subterfuge because the employer had adopted it prior to the Rehabilitation Act amendment that incorporated the subterfuge provision. In support of this conclusion, *Modderno* relied on two Supreme Court decisions interpreting a similar subterfuge provision in the Age Discrimination in Employment Act of 1967: *United Air Lines, Inc. v. McMann,* 434 U.S. 192, 98 S.Ct. 444, 54 L.Ed.2d 402 (1977), and *Betts,* 492 U.S. 158, 109 S.Ct. 2854, 106 L.Ed.2d 134. In those two cases, the Supreme Court construed "subterfuge" to have its "ordinary meaning as 'a scheme, plan, stratagem, or artifice of evasion.' " *Betts,* 492. U.S. at 167, 109 S.Ct. 2854 (quoting *McMann,* 434 U.S. at 203, 98 S.Ct. 444). Recognizing that the ordinary meaning of subterfuge includes a specific intent to circumvent or evade a statutory purpose, the Supreme Court held there could be no such intent if the challenged provision had been adopted prior to the statute's enactment. "In *McMann,* for instance, where the plan at issue had been adopted in 1941, long before the enactment of the ADEA, the Court observed that '[t]o spell out an intent in 1941 to evade a statutory requirement not enacted until 1967 attributes, at the very least, a remarkable prescience to the employer.' " *Modderno,* 82 F.3d at 1064 (quoting *McMann,* 434 U.S. at 203, 98 S.Ct. 444).

*Modderno's* application of *Betts* and *McMann* to section 501(c) of the ADA controls this case. It is undisputed that Aramark's long-term disability benefit plan, including the twenty-four-month cap on mental disability benefits challenged here, has been in place since at least 1982, long before the ADA's 1990 enactment. Under *Modderno,* therefore, the twenty-four-month benefit limit cannot fall within

section 501(c)'s subterfuge exception to the safe harbor.

Appellants offer three arguments why *Modderno* should not control this case, none of which is convincing. First, they claim that *Modderno* was wrongly decided because it overlooked a difference between the language of section 501(c)'s subterfuge provision and the language of the similar provision in section 4(f)(2) of the ADEA interpreted by *Betts*. They point out that while the ADEA gave safe harbor to a benefit plan "which is not a subterfuge to evade the purposes of this chapter," the ADA substitutes the phrase "shall not be *used as* a subterfuge to evade the purposes of subchapter[s] I and III of this chapter" 29 U.S.C. § 623(f)(2) (1990); 42 U.S.C. § 12201(c) (emphasis added). Even if a panel of this court could depart from settled precedent, which of course it cannot, *see, e.g., LaShawn v. Barry*, 87 F.3d 1389, 1395 (D.C.Cir.1996) (*en banc*), we are unpersuaded that what EEOC itself acknowledges to be a "subtle difference in language"—the addition of the words "used as"—would compel a different result.

In enacting section 501(c) of the ADA, Congress repeated the phrase "a subterfuge to evade the purposes of ... this chapter" just one year after *Betts* had interpreted that precise phrase in section 4(f)(2) of the ADEA to exclude pre-Act benefit plan provisions. According to EEOC, Congress signaled its rejection of the *Betts* interpretation by changing the words preceding that phrase from "is not" in the ADEA to "shall not be used as" in the ADA. While a benefit plan cannot *be* a subterfuge to evade the purposes of a not-yet-enacted statute, EEOC argues, it "can be '*used as* a subterfuge' regardless of when the plan was adopted." EEOC contends that merely by including the words "used as" in section 501(c), Congress expanded the subterfuge exception to re-move pre-ADA benefit plans from safe harbor protection. Instead of protecting all pre-Act plans, the safe harbor, as

EEOC reads it, functions as an affirmative defense that allows employers, benefit plan administrators, and insurance underwrit-ers to avoid liability for disability-based distinctions by showing on the basis of "sound actuarial principles" that the dis-tinctions are risk- or cost-justified.

The language of the two safe harbor provisions actually differs more extensively than even EEOC points out. The ADEA provision examined in *McMann* and *Betts* reads in pertinent part:

It shall not be unlawful for an employer, employment agency, or labor organiza-tion ... to observe the terms of ... any bona fide employee benefit plan such as a retirement, pension, or insurance plan, which is not a subterfuge to evade the purposes of this chapter. . . .

29 U.S.C. 623(f)(2) (1990). The ADA pro-vision reads as follows:

Subchapters I through III of this chap-ter and title IV of this Act shall not be construed to prohibit or restrict—

(1) an insurer, hospital or medical ser-vice company, health maintenance orga-nization, or any agent, or entity that administers benefit plans, or similar or-ganizations from underwriting risks, classifying risks, or administering such risks that are based on or not inconsis-tent with State law; or

(2) a person or organization covered by this chapter from establishing, sponsor-ing, observing or administering the terms of a bona fide benefit plan that are based on underwriting risks, classi-fying risks, or administering such risks that are based on or not inconsistent with State law; or

(3) a person or organization covered by this chapter from establishing, sponsor-ing, observing or administering the terms of a bona fide benefit plan that is not subject to State laws that regulate insurance.

Paragraphs (1), (2), and (3) shall not be used as a subterfuge to evade the pur-

poses of subchapter[s] I and III of this chapter.

42 U.S.C. § 12201(c). Under the ADEA, a benefit plan falls within the safe harbor only if the plan is both (1) bona fide and (2) not a subterfuge. In the ADA, by contrast, a benefit plan receives safe harbor protection if it is (1) bona fide and (2) either consistent with or exempt from state law, but the safe harbor provision "shall not be used as a subterfuge to evade the purposes of" Titles I and III of the ADA. In other words, under the ADA, it is not the benefit plan, but the safe harbor itself, that shall not be used as a subterfuge.

We think these semantic distinctions, including the one on which appellants rely, do not undermine *Modderno*. As *Modderno* pointed out, the Supreme Court interpreted the phrase "subterfuge to evade" to require a specific intent to circumvent a statutory purpose, thus excluding from the subterfuge exception all pre-Act plans. 82 F.3d at 1064. Fully aware of the judicial construction of this phrase, Congress used the very same phrase in the ADA's safe harbor. "[W]hen Congress chose the term 'subterfuge' for the insurance safe-harbor of the ADA, it was on full alert as to what the Court understood the word to mean and possessed (obviously) a full grasp of the linguistic devices available to avoid that meaning." *Id.* at 1065. *See also Bragdon v. Abbott,* 524 U.S. 624, 645, 118 S.Ct. 2196, 141 L.Ed.2d 540 (1998) ("When ... judicial interpretations have settled the meaning of an existing statutory provision, repetition of the same language in a new statute indicates, as a general matter, the intent to incorporate its ... judicial interpretations as well."). Whether a benefit plan "is" a subterfuge to evade the purposes of the law (the ADEA's language), or whether the safe harbor for benefit plans is "used as" a subterfuge to evade the purposes of the law (the ADA's language), the plain meaning of the phrase "subterfuge to evade" remains as defined by *McMann, Betts,* and *Modderno*—"a

scheme, plan, stratagem, or artifice of evasion." Under the ADA, then, "subterfuge to evade" still requires intent and still excludes pre-Act plans like Aramark's because, as *McMann* said, "[t]o spell out an intent in [1982] to evade a statutory requirement not enacted until [1990] attributes, at the very least, a remarkable prescience to the employer." *McMann,* 434 U.S. at 203, 98 S.Ct. 444. For the same reason, "subterfuge to evade" cannot mean merely a lack of actuarial justification. Indeed, appellants' contention that the safe harbor applies only to plans whose terms are actuarially justified has been rejected not only by *Modderno* but also by every other circuit to have considered the issue. *See Leonard F. v. Israel Discount Bank of New York,* 199 F.3d 99, 105 (2d Cir.1999) ("In the context of the subterfuge clause of Section 501(c) of the ADA, neither the dictionary definition nor the Supreme Court's reasonably suggests that absence of actuarial justification for differential insurance benefits is sufficient to demonstrate a 'subterfuge' to evade the purposes of an Act, at least where the insurance policy was adopted prior to the Act's passage."); *Rogers v. Department of Health and Envtl. Control,* 174 F.3d 431, 437 (4th Cir.1999) ("[W]e do not find anything in § 501(c) of the ADA (or anywhere else in the Act) that requires a plan sponsor or administrator to justify a plan's separate classification of mental disability with actuarial data."); *Ford,* 145 F.3d at 611–12 ("[W]e will not construe section 501(c) to require a seismic shift in the insurance business, namely requiring insurers to justify their coverage plans in court after a mere allegation by a plaintiff."); *Parker,* 121 F.3d at 1012 n. 5 (rejecting as inconsistent with the statutory text the view expressed in the Department of Justice Technical Assistance Manual that different insurance benefit or coverage levels based on disability are permitted only where "based on sound actuarial principles" or "related to actual or reasonably anticipated experience"); *Krauel v. Iowa Methodist Med. Ctr.,* 95 F.3d 674, 678–79 (8th Cir.

1996) (rejecting EEOC's interim guidance explaining actuarial justification defense as contrary to the plain language of the statute and thus not entitled to deference).

Congress's addition of the words "used as" is simply too thin a reed on which to support appellants' claim that Congress intended to overrule *Betts,* remove pre-Act plans from safe harbor protection, and give life to EEOC's uniformly rejected actuarial justification theory. After all, Congress responded to *Betts* by totally deleting the subterfuge language from the ADEA, just before it included the similar subterfuge provision in section 501(c) of the ADA. *See* Older Workers Benefit Protection Act of 1990, Pub.L. No. 101–433, § 103(1) (codified at 29 U.S.C. § 623(f)(2)). Had Congress also intended to repudiate *Betts* for ADA purposes, it could have omitted the provision from that statute as well.

Appellants' second argument is that *Modderno*'s discussion of section 501(c) is dicta. As they read the case, the decision rested on the observation that the plan provision challenged there, a lifetime limit on reimbursement for mental health treatment, did not discriminate on the basis of disability. Given that "holding," the Commission claims, the panel's discussion of section 501(c) was merely "ruminations" "not necessary to its holding," and therefore not binding on us. Not only did EEOC fail to raise this argument until its reply brief, *see, e.g., Presbyterian Med. Ctr. of the Univ. of Penn. Health Sys. v. Shalala,* 170 F.3d 1146, 1152 (D.C.Cir. 1999) (noting that we need not consider arguments raised for the first time in a reply brief), but it rests on a misreading of *Modderno.* After concluding that "[b]ecause the coverage limitations challenged by Modderno were enacted before the 1992 amendment of § 504 of the Rehabilitation Act (and there is no suggestion that their enactment was prompted by an expectation of amendment), they do not fall into the subterfuge exception to the ADA's safe-harbor," *Modderno* went on to say, in language the Commission fails to account

for: "Thus, whether or not Modderno stated a claim under the 1992 amendment of § 504 apart from the safe-harbor provision—*a question on which we express no opinion*—the coverage limitations challenged by Modderno cannot violate amended § 504." *Modderno,* 82 F.3d at 1065 (emphasis added). Because *Modderno*'s interpretation of the safe harbor was essential to its reasoning as well as to its disposition of the claims before it, it stands as binding precedent.

Finally, EEOC argues that even assuming we follow *Modderno*'s interpretation of section 501(c), this case differs from *Modderno* because Aramark modified the plan after the ADA's enactment. Appellants rely on two specific changes in Aramark's long-term disability benefit plan. First, the twenty-four-month limit on benefit payments previously applied to anyone whose disability is "a result of a mental or emotional illness," but now applies to disabilities "caused to any extent by a mental condition (including conditions related to alcoholism or drug abuse) described in the most current edition of the Diagnostic and Statistical Manual of Mental Disorders, published by the American Psychiatric Association." Second, for a mentally disabled participant confined to an inpatient psychiatric hospital at the time the twenty-four-month period ends, benefit payments under the prior plan would continue for the duration of hospitalization; under the revised plan, continuation of benefits is limited to ninety days beyond the twenty-four-month cutoff. According to EEOC, these two changes remove Aramark's plan from automatic safe harbor protection. We disagree.

To begin with, whatever effect the plan amendments may have, appellants concede that they did not apply to Fennell, whose benefits would have terminated after twenty-four months even under the plan's previous version. Neither appellant explains how the plan amendments could be a subterfuge to evade the ADA and discriminate against Fennell if they did not affect her.

Asserting that its suit is not limited to seeking relief for Fennell, EEOC argues that the plan amendments affected others by "increas[ing] the number of people subject to the limitation." Not only was this argument also raised for the first time in EEOC's reply brief, but the Commission's complaint alleges neither that Aramark amended the plan for the purpose of circumventing the ADA, *i.e.*, that the amendments were a subterfuge (its burden under *Betts*), nor that the amendments have ever been applied to terminate benefits to any-one not subject to the same cutoff under the previous plan.

The judgment of the district court is affirmed.

*So ordered.*