BOCA INVESTERINGS PARTNERSHIP, a Partnership and American Home Products Corporation, Tax Matters Partner, Appellees,

v.

UNITED STATES of America, Appellant.

No. 01–5429.

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 21, 2002.

Decided Jan. 10, 2003.

Mark V. Holmes, Attorney, U.S. Department of Justice, argued the cause for appellant. With him on the briefs were Roscoe C. Howard, Jr., U.S. Attorney, Richard Farber and Edward T. Perelmuter, Attorneys, U.S. Department of Justice.

Christopher Kliefoth argued the cause for appellees. With him on the brief were William L. Goldman and Diane L. Cafritz. Melvin White entered an appearance.

Before: SENTELLE, HENDERSON and TATEL, Circuit Judges.

Opinion for the Court filed by Circuit Judge SENTELLE.

SENTELLE, Circuit Judge:

In 1990, American Home Products (AHP), sold a subsidiary, Boyle–Midway, for a capital gain of more than $605 million. Just before the sale, Merrill Lynch approached AHP with an investment plan which would enable AHP to claim paper tax losses of a comparable amount, while generating only about $8 million in actual losses. AHP was one of several Fortune 500 companies that Merrill approached with this idea, and this is the third case before us involving this particular type of scheme. *See Saba P'ship v. Comm'r,* 273 F.3d 1135 (D.C.Cir.2001); *ASA Investerings P'ship v. Comm'r,* 201 F.3d 505 (D.C.Cir.2000). Following Merrill Lynch's

proposal, AHP formed Boca Investerings Partnership with another AHP subsidiary and two foreign corporations. After completing the transactions proposed by Merrill Lynch, AHP filed tax returns which reflected the losses offsetting its capital gains for 1990–1993. After the Internal Revenue Service challenged these returns, AHP filed a complaint in the district court contesting the Commissioner of Internal Revenue's proposed adjustments to its partnership returns, and on October 5, 2001, the district court issued an opinion rejecting the Commissioner's adjustments, and entering judgment in favor of Boca. *See Boca Investerings P'ship v. United States*, 167 F.Supp.2d 298 (D.D.C.2001). We reverse the district court's decision as inconsistent with *ASA Investerings*, 201 F.3d 505.

*Background*

We explored this Merrill Lynch-created tax shelter and the regulation on which it depends at significant length in our opinion in *ASA Investerings*, 201 F.3d at 506–08, and therefore will not belabor the details here. The plan proposed by Merrill Lynch to AlliedSignal, the domestic corporation involved in the ASA partnership, was virtually identical to the one Merrill proposed to AHP in the case before us now. The plan requires the formation of a partnership between a United States corporation and a foreign corporation not subject to United States tax, combined with a series of investment transactions that exploit the terms of Temp. Treas. Reg. § 15A.453–1(c)(3)(I) (26 C.F.R.). That regulation provides a tax accounting rule for contingent installment sales. An installment sale is defined in the code as "a disposition of property where at least 1 payment is to be received after the close of the taxable year in which the disposition occurs." I.R.C. § 453(b)(1) (2001). A contingent installment sale is one where the total purchase price is unknown at the time of the transaction. Because the total price is unknown, the total gain on the sale is likewise unknown. The regulation supplies a general rule of "ratable basis recovery" for situations where a seller at least knows the maximum period over which the purchase price will be paid. The partnership formed between the domestic entities and the foreign entities takes advantage of this regulation by first buying, then immediately selling a debt instrument on an installment basis.

As we noted in our opinion in *Saba Partnership,* which also considered this regulation and another virtually identical series of transactions, "[a]lthough the transaction is basically a wash, generating hardly any economic gain or loss, Merrill Lynch's lawyers' interpretation of the relevant provisions allows the partnership to claim a massive tax gain, which is allocated to the foreign partner, and a massive tax loss, which the U.S. corporation keeps for itself." 273 F.3d at 1136. This sentence essentially describes the transactions in which AHP; its subsidiary; and its foreign partners, Syringa and Addiscombe, engaged after forming the Boca partnership. The massive loss AHP was able to claim for tax purposes was then used to offset the tax gain it realized from the sale of its subsidiary, Boyle–Midway.

The facts in this case are substantially similar to those in *ASA Investerings* and *Saba Partnership.* In 1990, Merrill Lynch representatives approached AHP, as it had also approached AlliedSignal and Brunswick, other Fortune 500 companies, with the idea for this scheme to shelter large capital gains. After meeting with the representatives, Thomas Nee, AHP's vice-president for taxes prepared a memorandum for AHP's Chairman and Chief Executive Officer, John Stafford, entitled, "*Tax Planning Re: Sale of Boyle–Midway.*"

This memo outlined the proposal as follows, in pertinent part.

### 1) Formation of Partnership

The partnership would be formed in a favorable tax jurisdiction such as the Netherlands, Antilles under the New York general partnership law. The members of the partnership would be AHPC, one of its domestic subsidiaries (henceforth referred to as AHPC) and an unrelated foreign financial institution (XYZ). AHPC will contribute cash of $110 million (representing a 10% ownership) and XYZ will contribute $990 million. Under the partnership agreement, all the income, gain, expense and loss of the partnership will be allocated among the members in proportion to their capital accounts. * * *

### 2) Purchase of Corporate Bonds

* * * [I]nvest $1.057 billion in [corporate bonds]* * *

### 3) Installment Sale

The Partnership will sell the Bonds to a financial institution in exchange for $898.5 million in cash and $158.5 million at fair market value, five year LIBOR installment notes. * * *

### 4) Increase of AHPC's Partnership Interest

Following Step 3, AHPC will purchase a 45.5% interest in the partnership from XYZ for $500 million in cash bringing its total interest to 55.5% and XYZ's interest down 44.5%.

### 5) Contribution of Assets to Partnership

AHPC will thereupon contribute assets with a fair market value of $200 million to the partnership further increasing its partnership interest to 62%. * * *

### 6) Partial Redemption of Partnership Interest

The partnership will distribute $159 million fair market value installment note to AHPC and $96 million in cash to XYZ. * * *

### 7) Sale of Installment Note

* * * $159 million in cash resulting in a $723.2 million in capital loss

* * *

The memo also noted that, "[w]e believe that the above transaction is technically sound. We expect it would be vigorously attacked by the IRS. * * * Merrill Lynch is requesting a fee of $8 million. Their contribution is significant in that they identify XYZ, arrange for purchase of the Corporate Assets (Bonds) and locate a buyer for the installment notes."

AHP decided to accept Merrill Lynch's proposal and the transaction took form by precisely following the steps laid out in Nee's memo. *Boca Investerings*, 167 F.Supp.2d at 319. On April 19, 1990, the Boca partnership was formed between partners AHP; another AHP subsidiary and two Netherlands Antilles special purpose corporations, Addiscombe and Syringa, with initial partner contributions mirroring those anticipated in the memo. *Id.* Merrill Lynch received a $7 million fee for structuring the transaction. On May 1 and 2, 1990, Boca purchased $1.1 billion of private placement floating-rate notes (PPNs) from two Japanese banks and PepsiCo. *Boca Investerings*, 167 F.Supp.2d at 329–30. A week after Boca made the purchases, Merrill Lynch began arranging for the sale of the PPNs. During one week in late May, 1990, Boca sold over $1 billion of the PPNs for $880 million in cash, and indefinite debt instruments known as LIBOR (London Interbank Offering Rate) notes. *Boca Investerings*, 167 F.Supp.2d

at 333–34. The district court found that this sale generated transaction costs of $13 million, which was ultimately borne by AHP, *id.* at 337, and that Boca received less than $7 million in interest on its $1.1 billion investment in the PPNs, *id.* at 351.

On its 1990 partnership tax return, Boca treated the sale as an installment sale under I.R.C. § 453(b). *Id.* at 362. Boca reported a short-term capital gain of over $721 million from the transaction, calculated by subtracting the ratably-recovered basis from the $880 million in cash generated by the sale of the PPNs. *Id.* Ten percent of the gain was allocated to AHP and its domestic subsidiary, while the remaining ninety percent was allocated to the foreign partners, who were not subject to U.S. tax on the gain. *Id.* ABN, a Netherlands bank which controlled the two foreign partnerships, *id.* at 319, and was also involved in the Saba Partnership and ASA Investerings transactions, *see Saba P'ship*, 273 F.3d at 1138–40; *ASA Investerings*, 201 F.3d at 508–11, entered into interest-rate swaps with Addiscombe, Syringa and Merrill Lynch to hedge the interest-rate risk on the LIBOR notes. *Boca Investerings*, 167 F.Supp.2d at 360, 361.

On July 20, 1990, the parties agreed that AHP would purchase approximately 45% of Syringa's interest in Boca at a $2.5 million above-book-value premium. *Boca Investerings*, 167 F.Supp.2d at 338. This transaction left the foreign partners with approximately a 45% ownership interest in Boca. *Id.* at 339. In August 1990, Boca distributed $175 million in cash to the foreign partners and nearly $220 million in LIBOR notes to the AHP partners. *Id.* at 341. In September and October 1990, Boca redeemed more of the foreign partners' interest, resulting in an 85% ownership interest for the AHP partners. *Id.* at 343, 344. In November 1990, the AHP

partners sold the LIBOR notes Boca had distributed to them. *Id.* at 344–45. This disposition triggered a paper loss of more than $770 million for AHP. *Id.* at 345. This loss offset the capital gains of AHP from the sale of Boyle–Midway, and other gains from 1990 to 1993. *Id.* In December 1990, AHP redeemed Syringa's remaining interest in Boca for cash. *Id.* Finally, in September 1991, the foreign partners were bought out of Boca entirely, with the cash redemption of Addiscombe's remaining interest, which included a premium of $2.2 million above book value. *Id.* at 346–47.

Following the government's audit of Boca's partnership tax returns for 1990–1993, the Commissioner of Internal Revenue proposed different adjustments based on different theories. Under one theory, the Commissioner found that the foreign entities had not entered into a valid partnership with AHP, and therefore recognized the Merrill Lynch transaction for tax purposes, but allocated all the gains and losses reported by Boca to AHP. Under a second theory, that the transaction was an economic sham, the Commissioner eliminated any gains and losses reported by Boca as resulting from the transaction. AHP deposited with the Treasury the amount it determined would be due as a result of the proposed adjustments and filed suit in district court contesting the Commissioner's proposals. The district court determined after a lengthy trial that the Commissioner erred in proposing the adjustments. *See Boca Investerings*, 167 F.Supp.2d at 388. The government's appeal is now before us.

We review the findings of fact of the district court under the "clear error" standard. *ASA Investerings*, 201 F.3d at 511. "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evi-

dence is left with the definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948). The district court, after a seventeen day trial, issued a well-documented and cross-referenced 180 page opinion which included 392 separate findings of fact, as well as conclusions of law.

*Analysis*

■ At the outset, we reject two of the government's assignments of error without difficulty. Although the district court reached a different conclusion than other courts had on previous occasions in cases with very similar facts, these findings of fact do not constitute clear error by the district court. The mere similarity of facts in two cases with different litigants and different evidence provides no basis for a finding of clear error on the part of either trial judge whose findings differ from the other. This is particularly evident in a case such as this in which many of the district court's findings were based on the demeanor and believability of witnesses at trial. *See Boca Investerings*, 167 F.Supp.2d at 303. Nor did the district court err when it refused to admit into evidence materials which did not relate to the parties in this case and which the government argued should be admitted principally because they were admitted as evidence in *ASA Investerings*. However, our rejection of these assignments of error does not mean we reject all assignments. We reverse the judgment below because the district court erred as a matter of law when it did not properly apply the holding of *ASA Investerings*, requiring that a legitimate non-tax business necessity exist for the creation of the otherwise sham entity inserted into the partnership for tax avoidance reasons in order to meet the intent test of *Commissioner v. Culbertson*,

337 U.S. 733, 69 S.Ct. 1210, 93 L.Ed. 1659 (1949), as applied to this type of partnership transaction.

■ The government argues that the district court erred in determining that this case was materially different from the case in *ASA Investerings*, in which we affirmed the Tax Court's ruling that a very similar partnership between AlliedSignal and ABN Bank was a sham for purposes of the "business purpose doctrine." We agree. While the similarity of facts in the two cases does not, in itself, invalidate the district court's finding that Boca Investerings Partnership was not a sham partnership, the district court's misapplication of *ASA Investerings*'s instructions for interpreting transactions such as these does constitute reversible error. As we noted in *Saba Partnership*, "*ASA* makes clear that 'the absence of a nontax business purpose is fatal' to the argument that the Commissioner should respect an entity for federal tax purposes." 273 F.3d at 1141 (quoting *ASA Investerings*, 201 F.3d at 512).

Boca claimed at oral argument and in a post-argument submission that the government failed to raise the requirement stated in *ASA Investerings* that a partnership have a non-tax need in order for it to be recognized for tax purposes. Accordingly, Boca argues that we should not consider this point on appeal, citing *Flynn v. Commissioner*, 269 F.3d 1064, 1068–69 (D.C.Cir.2001) ("generally an argument not made in the lower tribunal is deemed forfeited and will not be entertained absent exceptional circumstances.") However, as the government rightly points out, its Memorandum of Points and Authorities filed with the district court approximately three months before trial expressly argues "given the substantial costs incurred, AHP's use of this elaborate 'part-

nership' cannot be justified by a non-tax business purpose. The factual similarity to the *ASA Investerings* partnership case is obvious and undeniable."

■ The business purpose doctrine applied in *ASA Investerings* establishes that while taxpayers are allowed to structure their business transactions in such a way as to minimize their tax, these transactions must have a legitimate non-tax avoidance business purpose to be recognized as legitimate for tax purposes. The reasoning behind this doctrine is readily applicable to this case. As we noted in *ASA Investerings*:

> A tax system of rather high rates gives a multitude of clever individuals in the private sector powerful incentives to game the system. Even the smartest drafters of legislation and regulation cannot be expected to anticipate every device. The business purpose doctrine reduces the incentive to engage in such essentially wasteful activity, and in addition helps achieve reasonable equity among taxpayers who are similarly situated—in every respect except for differing investments in tax avoidance.

201 F.3d at 513.

We then approved the Tax Court's approach to the Supreme Court's test set out in *Culbertson* which determined that the existence of a partnership would depend on whether, "considering all the facts ... the parties in good faith and acting with a business purpose intended to join together in the present conduct of the enterprise." *ASA Investerings*, 201 F.3d at 511 (quoting *Culbertson*, 337 U.S. at 742, 69 S.Ct. at 1214). We stated that "the Tax Court was, we think, sound in its basic inquiry, trying to decide whether, all facts considered, the parties intended to join together as partners to conduct business activity for a purpose other than tax avoidance." *Id.* at 513. Finally, we affirmed the Tax

Court's conclusion that AlliedSignal and ABN did not have "the requisite intent to join together for the purpose of carrying on a partnership." *Id.* at 511 (quoting 76 T.C.M. at 335).

As the government argued, *ASA Investerings* set out factors which pointed to AlliedSignal's lack of a legitimate nontax business purpose for its transactions with the partnership. "[T]his evidence says nothing about AlliedSignal's use of the elaborate partnership—with a pair of partners concocted for the occasion. There is no reason to believe that AlliedSignal could not have realized [AlliedSignal's assistant treasurer]'s interest rate play without the partnership at far, far lower transactions costs." *Id.* at 516. In the current case, the district court never made a finding of fact in regard to the necessity of AHP's acquisition of foreign partners in order to engage in the transactions. No official testified that AHP needed a partnership with a foreign corporation to invest in LIBOR notes or PPNs. AHP's participation in the partnership defies common sense from an economic standpoint, since it could have purchased the PPNs and the LIBOR notes directly, and avoided millions in transaction costs, including the $7 million fee it paid to Merrill Lynch and the "premiums" paid to the foreign partners for the purchase of their ownership interests.

Without a finding on the business need for the partnership from AHP's standpoint in this transaction, the judgment under review cannot stand. In addition, the foreign partners Syringa and Addiscombe were, like the foreign entities in *ASA*, "concocted" for the occasion—neither having existed prior to the transaction's commencement, nor serving any other purpose, and both being funded through loans from ABN, the bank which we found to lack the requisite intent to enter a legiti-

mate business partnership with Allied Signal in *ASA*. In fact, the parties stipulated in the court below that both entities came into being only on April 19, 1990, the same day that Boca was created. Stip. of Facts at ¶ 29. Nothing in the record indicates that AHP ever considered or weighed the benefits of using a different type of transaction in order to make these investments, including the option of purchasing them directly.

Boca argues that the district court made the finding that the parties "intended to, and did, organize Boca as a partnership to share the income, expenses, gains and losses from Boca's investments." *Boca Investerings*, 167 F.Supp.2d at 349–50. This finding, contrary to the appellee's assertion, does not satisfy the legal test for recognition of this type of partnership for tax purposes, as we held in *ASA Investerings*. In order to satisfy the legal test for this type of partnership, the district court must have found a non-tax business purpose need for the partnership in order to accomplish the goals of the partners. In this case, there is no evidence of any need for AHP to enter into the Boca partnership with the newly-minted Addiscombe and Syringa in order to invest in the LIBOR notes and PPNs. Nor is there even evidence of any non-tax purpose in the use of the partnerships. The only logical explanation then, for the partnership's formation was the exploitation of Temp. Treas. Reg. § 15A.453–1(c)(3)(I) and the gain of a paper tax loss to absorb its enormous capital gains. The district court stated as its first conclusion of law that

> the transactions financing the purchase and sale of the PPNs had economic substance, were not prearranged and predetermined, and had a legitimate purpose. They therefore should be recognized for federal income tax purposes.

*Boca Investerings*, 167 F.Supp.2d at 364. As the record would not support a finding that the partnership form served any non-tax business purpose, this conclusion is unsupported, inconsistent with *ASA Investerings*, and constitutes reversible error.

Boca argues that the clear error standard places a heavy burden on the appellant upon review, and we agree that there was ample evidence in the record to support the numerous and well-documented findings of fact made by the district court. As we stated above these findings are not the problem. The principal error is in the lack of findings on the nontax purpose for the partnership, but that error is determinative. We do not of course suggest that in every transaction using a partnership a taxpayer must justify that to form, but as we made clear in both *ASA Investerings* and *Saba Partnership*, where taxpayers use an "elaborate partnership" with entities created solely for the purpose of the questioned transaction, "the absence of a non-tax business purpose" is fatal to the recognition of the entity for the tax purposes. *ASA Investerings*, 201 F.3d at 512. *See also Saba P'ship*, 273 F.3d at 1141. Because the district court did not find that a legitimate, non-tax necessity existed for the formation of the Boca partnership, and because the evidence of record would not have supported such a finding if made, we reverse.