T.C. Memo. 2009-295


UNITED STATES TAX COURT


VIRGINIA HISTORIC TAX CREDIT FUND 2001 LP, VIRGINIA HISTORIC TAX
CREDIT FUND 2001, LLC, TAX MATTERS PARTNER, ET AL.,[1] Petitioner
v. COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket Nos. 716-08, 870-08,        Filed December 21, 2009.
            871-08.


        R issued a partnership and its two pass-thru
partners (lower-tier partnerships) notices of final
partnership administrative adjustment (FPAAs) for 2001
and 2002 increasing each of the partnerships' ordinary
income for unreported sales of Virginia Historic
Rehabilitation Tax Credits (State tax credits). In
doing so, R determined that certain limited partners
and members (investors) of the partnerships were not
partners for Federal tax purposes but instead were
purchasers of State tax credits from the partnerships.
R determined, in the alternative, that the investors'

_____

        [1]This case is consolidated for trial, briefing, and opinion
with Virginia Historic Tax Credit Fund 2001 SCP, LLC, Virginia
Historic Tax Credit Fund 2001, LLC, Tax Matters Partner, Docket
No. 870-08, and Virginia Historic Tax Credit Fund 2001 SCP, LP,
Virginia Historic Tax Credit Fund 2001, LLC, Tax Matters Partner,
Docket No. 871-08.

contributions of capital and the partnerships' allocation of State tax credits to them were disguised sales under sec. 707, I.R.C.

Held:  The investors were partners for Federal tax purposes rather than purchasers of State tax credits.

Held, further, the transactions between the investors and the partnerships were not disguised sales under sec. 707, I.R.C.

Held, further, the limitations period for assessment bars the adjustments for 2001 in the FPAAs.

David D. Aughtry and Hale E. Sheppard, for petitioner.[2]

Mary Ann Waters, Jason M. Kuratnick, Alex Shlivko, Warren P. Simonsen, Paul T. Butler, and Timothy B. Heavner, for respondent.

## MEMORANDUM FINDINGS OF FACT AND OPINION

KROUPA, Judge:  These consolidated cases arise from notices of final partnership administrative adjustment (FPAAs) issued to Virginia Historic Tax Credit Fund 2001 LP (the source partnership), Virginia Historic Tax Credit Fund 2001 SCP, LLC (SCP LLC), and Virginia Historic Tax Credit Fund 2001 SCP, LP (SCP LP) (collectively, Virginia Historic Funds or partnerships) for 2001 and 2002.  Respondent took alternative "whipsaw" positions in the six FPAAs, determining that the partnerships had

---

[2]We use "petitioner" for convenience to reflect that the petitions in these consolidated cases were filed by the partnerships' shared tax matters partner.

collectively failed to report income of $7,058,503 ($7 million) from the sale of State tax credits in either 2001 or 2002.[3] Respondent also determined that the partnerships were liable for accuracy-related penalties for negligence and substantial understatement of income tax under section 6662.[4]

After concessions,[5] we are left to decide three issues. The first issue is whether certain limited partners or members (investors) were partners of the Virginia Historic Funds for Federal tax purposes. We hold that they were. The second issue is whether the transactions between the partnerships and the investors were disguised sales under section 707. We hold that the transactions were not disguised sales. The third issue is whether the 6-year limitations period under section 6229(c)(2) for substantial omission of gross income applies. We hold it

---

[3]The parties have stipulated that if respondent prevails on the merits, the Virginia Historic Tax Credit Fund 2001 LP would have no adjustment for 2001.

[4]All section references are to the Internal Revenue Code (Code) in effect for the years at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated.

[5]Respondent has conceded the determinations in the notices of final partnership administrative adjustment (FPAAs) at issue disregarding the partnerships under sec. 1.701-2(b), Income Tax Regs.

does not and that the determinations in the FPAAs are therefore untimely for 2001.[6]

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulations of fact and settled issues and their accompanying exhibits are incorporated by this reference. The Virginia Historic Funds' principal place of business was in Virginia at the time the petitions were filed.

Overview of Tax Credits for Historic Rehabilitation

The Federal Government has created various tax incentives to encourage taxpayers to participate in otherwise unprofitable activities that benefit the public welfare. For example, section 47(a) allows for a Federal tax credit of 20 percent of the qualified rehabilitation expenditures with respect to any certified historic structure (Federal tax credit). The Federal tax credit encourages private sector rehabilitation of historic buildings.

In addition, Congress has declared that it is a policy of the Federal Government to give maximum encouragement to organizations and individuals undertaking preservation by private means and to assist States in expanding and accelerating their

---

[6]Respondent relies only on sec. 6229(c)(2) in arguing that the FPAAs were timely.

historic preservation programs and activities. National Historic Preservation Act of 1966, as amended 16 U.S.C. sec. 470-1 (2006).

The Need for State Tax Credits

Conventional lenders are often unwilling to finance the entire cost of a historic rehabilitation project because the cost often exceeds the fair market value of the structure after rehabilitation is complete. The Commonwealth of Virginia is one of several States that have enacted legislation providing for historic rehabilitation State income tax credits (State tax credits) to address this credit gap. The Virginia Historic Rehabilitation Credit Program (Virginia Program) was enacted in 1996 and provides State tax credits to individuals and businesses to encourage the preservation of historic residential and commercial buildings. In addition, the Virginia Program helps the owner or developer of a historic property attract the necessary capital to fill the gap between costs and conventional financing.

State tax credits issued to the owner of historic property often exceed the owner's State tax liabilities. The Virginia Program includes a partnership allocation provision that allows owners to use their excess credits to attract capital contributions from other entities or individuals. See Va. Code Ann. sec. 58.1-339.2 (2009). This allocation provision provides that State tax credits granted to a partnership are to be

allocated among all partners either in proportion to their ownership interest in the partnership or as the partners mutually agree. Id. Thus, the State allocation provision allows an owner to allocate a disproportionate share of the State tax credits to limited partners whose contributions then fill the credit gap. Many historic rehabilitation projects involve a developer partnership composed of a developer or owner, a State tax credit partner like the source partnership, and a Federal tax credit partner, which is often a large national corporation that may not be doing business in the State. Generally, Federal tax credits must be allocated in accordance with a partner's profits interest so that the Federal tax credit partner may hold as much as a 98-percent developer partnership interest. See sec. 1.704-1(b)(4)(ii), Income Tax Regs. The Virginia Program's allocation provision allows the State tax credit partner to have a small ownership percentage in the developer partnership that does not substantially interfere with the allocation of Federal tax credits. The State tax credit partner, however, receives most of the excess State tax credits. Developers depend on State tax credits to attract the capital necessary to cover the credit gap and provide a viable alternative to demolishing historic structures that might otherwise be destroyed.

Mechanics of the Virginia Program

Several States have programs similar to the Virginia Program, but the programs vary from State to State with respect to eligibility, credit amount, caps, and transferability. The Virginia Program provides dollar-for-dollar State income tax credits against Virginia income tax liability for taxpayers who meet the Virginia Program's guidelines. The Virginia Program was codified in Va. Code Ann. sec. 58.1-339.2, and the Virginia Department of Historic Resources (DHR) manages and administers the Virginia Program with the assistance of the Virginia Department of Taxation. A taxpayer must submit an application to the DHR and comply with the Secretary of the Interior's guidelines for rehabilitating historic buildings to receive tax credits under the Virginia Program.

The amount of credits granted for a rehabilitation project depends on the amount of eligible expenses incurred. Credits were allowed for up to 25 percent of eligible expenses incurred during the years at issue. A party incurring eligible expenses must submit an application to the DHR to receive a Certification of Rehabilitation (certificate). The taxpayer must attach the certificate to the Virginia tax return on which credits are claimed. Generally, credits must be reported in the year in which the certified rehabilitation project is completed.

Projects may also be completed in phases, however, with qualification of credits at the end of each phase.

The Virginia Program provides that the credits may be carried over for 10 years if a taxpayer's Virginia income tax liability is less than the amount of credits granted for a given year. The credits are not, however, refundable or inheritable. They are also not transferable with the exception of credits received while there was a temporary one-time transfer provision in effect.

Unlike other State programs, the Virginia Program, as originally enacted, did not allow for the transfer of State tax credits. Some projects were started, however, with the understanding that the credits would be transferable. In 1999, the Virginia Program was amended to provide for a one-time transfer of credits only for projects certified before the publication of the final regulations under the Virginia Program (Program regulations). The purpose of the one-time transfer provision was to protect projects that had begun under the assumption that the credits would be transferable. All one-time transfers required approval by the director of the DHR. The director, Kathleen Kilpatrick, approved transfers only from the entity or individual initially earning the credits. The DHR operated the Virginia Program for several years without the benefit of Program regulations. The one-time transfer provision

was not included in the final Program regulations, which were not published until September 2002.

Daniel Gecker and the Formation of the Virginia Historic Funds

The Internal Revenue Service (IRS) had issued no direct guidance regarding the Federal tax treatment of allocated State tax credits when the Virginia Program was enacted. Accordingly, the DHR sought advice from professionals with expertise in the areas of tax credits and historic rehabilitation in drafting the Program regulations. In 1996 the director of the DHR asked Daniel Gecker to serve on the DHR committee that assisted in drafting the Program regulations. Mr. Gecker had represented clients involved in historic rehabilitation and Federal historic credits as an attorney for 20 years when the Virginia Program was enacted. In addition, Mr. Gecker consulted regularly with other practitioners across the country including William Machen, a well-known tax credits practitioner and partner at Holland & Knight, regarding the Federal tax implications of State tax credits generally and of the Virginia Program's allocation provision specifically. Mr. Gecker agreed to help draft the regulations and has continued to provide legal and other advice to the DHR and its personnel pro bono. In addition, Mr. Gecker served as the managing partner of the Richmond office of Kutak Rock, LLP, one of a few national firms with a tax credits practice.

Robert Miller and George Brower also provided their expertise to the DHR.  Mr. Miller had been restoring historic buildings as a real estate developer for over 30 years when introduced to the Virginia Program.  Mr. Brower was a senior vice president of Howard Weil, a division of the investment firm Legg Mason Wood Walker Inc. (Legg Mason).  Mr. Gecker, Mr. Miller, and Mr. Brower realized that funding existed for large rehabilitation projects, yet many smaller projects had difficulty obtaining financial support.  They discussed ways to increase the Virginia Program's reach by pooling capital for smaller projects that did not have the resources to attract funding.  These discussions were the springboard for the idea that became the Virginia Historic Funds.

Overview of the Virginia Historic Funds

Mr. Gecker, Mr. Miller, and Mr. Brower (the principals) formed Virginia Historic Tax Credit Fund 2001, LLC (general partner) in 2001 to provide funding for smaller historical rehabilitation projects.  The general partner was the tax matters partner (TMP) and general partner or managing member of the source partnership and its pass-thru partners, SCP LLC and SCP LP (lower-tier partnerships).  The purpose of the partnerships was to acquire interests in a diverse selection of partnerships or limited liability companies (developer partnerships) that were involved in the qualified rehabilitation of real property and

entitled to State tax credits.  The partnerships could then pool capital to support both large and small historic rehabilitation projects.  Some of the resulting State tax credits would then be allocated to the partnerships and, ultimately, to the investors.

Mr. Gecker and Mr. Miller each held a 35-percent interest in the general partner.  Mr. Miller held his interest through his wholly owned entity BKM, LLC (BKM).  Mr. Brower held the remaining 30-percent interest.  The principals were actively involved in the partnerships' activities.  Mr. Gecker contributed his legal skills and knowledge of Federal and State tax credits.  Mr. Miller contributed his knowledge of historic rehabilitation and served as the developer of some of the projects that generated the credits at issue.  Finally, Mr. Brower was primarily responsible for communications between the Virginia Historic Funds and the developer partnerships.

Marketing the Partnerships

The Virginia Historic Funds actively sought investors willing to contribute capital to the partnerships during the years at issue.  The principals approached various accounting and investment firms to locate interested investors.  These firms examined the structure of the partnerships and provided advice to their clients about participating in the partnerships.  Multiple representatives of these firms stated they discussed the partnership allocation provision of the Virginia Program with the

investors they referred to the partnerships.  In addition, the accounting firms typically coordinated the execution of their clients' agreements with the partnerships and handled their Virginia and Federal tax planning and reporting.

Several pamphlets and letters were used to market the Virginia Historic Funds.  Some of the marketing materials originated with Mr. Brower and were used in communications with developer partnerships or investors.  Other materials were prepared by accounting firm Witt Mares & Co., PLC (Witt Mares) and were given to some of its clients.  The Witt Mares materials addressed both the State and Federal tax consequences of investment in the Virginia Historic Funds.  The written promotional materials distributed by the partnerships emphasize the dual purpose of investment in the partnerships.  These materials highlighted the partnerships' role in the preservation of Virginia's architectural heritage and discussed numerous benefits of rehabilitation to the community at large.  The materials also addressed the role of State tax credits in funding historic rehabilitation and the Virginia Program's partnership allocation provision.  The marketing materials advise potential investors that they must invest as partners in the partnerships to be entitled to State tax credits.  Some of the marketing materials use the colloquial terms "sell" or "sold" when discussing the Virginia Program's complicated allocation

provision.  These terms were quoted, stressing that they were colloquialisms.

Investors

The investors' participation in the partnerships is the focus of this litigation.  The source partnership included 181 investors, while SCP LLC included 93 investors and SCP LP included eight investors.  Each investor made a contribution of capital in exchange for a partnership or LLC interest.  The 181 investors in the source partnership collectively contributed $3,959,962, SCP LP's eight investors collectively contributed $1,494,000, and SCP LLC's 93 investors collectively contributed $1,541,370.  The lower-tier partnerships contributed all their capital contributions to the source partnership.  Accordingly, the total investor contributions to the source partnership were $6,995,332.

The partnerships were tiered to reflect the various ways investors were introduced to the Virginia Historic Funds.  The investors in SCP LP were largely clients of Legg Mason.  Similarly, the investors in the source partnership and in SCP LLC were clients of Witt Mares or Biegler & Associates, P.C., another accounting firm.

## Structure of the Virginia Historic Funds

The following graph depicts the structure of the Virginia Historic Funds.



Partnership Documents

The investors signed partnership agreements, subscription agreements, and option agreements (partnership documents) and wrote checks for their respective capital contributions. The partnership agreements contained standard provisions defining the operation of the partnerships and the relationships of the parties involved. The partnership agreements provided that the partners would share in the partnerships' profits and losses in proportion to their respective ownership interests and that the partners were entitled to distributions upon dissolution in accordance with positive balances in their respective capital accounts, all as required by State law. The subscription agreements set the investors' capital contribution and expected allocation of State tax credits. Generally, an investor would contribute 74 cents for every dollar of expected State tax credit.

The partnership documents included traditional limited partnership provisions that limited the investors' liability for partnership debts to their individual capital contributions. The partnership agreements also included language that limited the risk to the investors' capital contributions. This language indicated that the investors would receive a part of their contribution back, less expenses, if the partnerships failed to pool sufficient State tax credits. The partnerships balanced

this risk by including provisions in its agreements with the developer partnerships that the developer partnerships would compensate the Virginia Historic Funds if the developer partnerships failed to obtain State tax credits or if the credits were revoked. Finally, the option agreements provided that the general partner could purchase an investor's limited partnership interest for fair market value after the partnership had fulfilled its purpose.

Activities of the Virginia Historic Funds in 2001

The source partnership became a partner in each of several developer partnerships that earned State tax credits for 2001. The source partnership also purchased State tax credits earned in 2001 under the one-time transfer provision. The pooled credits were not designated for allocation to any one particular investor. Instead, the investors were allocated a share of credits from the pool of credits. The partnerships allocated the State tax credits to the investors on their respective Schedules K-1, Partner's Share of Income, Credits, Deductions, etc., for 2001. The investors in the source partnership were allocated $5,354,302 of pooled credits, the investors in SCP LLC were allocated $1,972,297 of credits, and the SCP LP investors were allocated $1,867,500. The State tax credits were not transferable when held by the partnerships or the investors. The

investors were eventually bought out after the partnerships accomplished their purpose.

The Partnerships' Reporting Position

The Virginia Historic Funds timely filed Forms 1065, U.S. Return of Partnership Income, for both 2001 and 2002. The partnerships reported the tax credit allocations to their investors on Schedules K-1 and included the accompanying certificates. Similarly, the partnerships reported capital contributions from their respective investors. The source partnership also reported the flow-through contributions from the lower-tier partnerships.

In addition, the source partnership reported expenses of $1,662,815 in 2001 and $1,479,373 in 2002 for "Tax Credit Acquisition Fees" on its Forms 1065. The source partnership incurred these expenses when it acquired tax credits under the one-time transfer provisions in the Virginia Program. The source partnership also deducted $30,000 in 2001 and $58,164 in 2002 for legal expenses.

Respondent's Examination of the Virginia Historic Funds

Respondent launched concurrent examinations for the partnerships' 2001 and 2002 taxable years, as well as the 2002 and 2003 taxable years of the 2002 Virginia Historic Funds (successor entities). Respondent's revenue agent met with Mr. Gecker and other partnership representatives on multiple

occasions with respect to each entity.  Mr. Gecker cooperated with the revenue agent, explaining the operations of the various entities in detail and describing their relationships with one another.  The Virginia Historic Funds did not execute extensions of the period of limitations on assessment for 2001.  They did execute extensions for 2002, however.

Respondent issued the source partnership and the lower-tier partnerships six separate FPAAs for 2001 and 2002 in October 2007.  Respondent determined that the investors were not partners for Federal tax purposes and that the investors' capital contributions to the partnership and receipt of the State tax credits in return were instead sales of State tax credits.  In the alternative, respondent determined that, if the investors were partners, the transactions were disguised sales of State tax credits.  Respondent also determined that each partnership recognized unreported income from these sales in the amount of its investors' collective capital contributions.  Finally, respondent determined in each of the respective FPAAs that "the partnership was formed with a principal purpose to reduce substantially the present value of the partners' aggregate tax liability in a manner that is inconsistent with the intent of subchapter K.  Accordingly, the partnership should be disregarded pursuant to Treas. Reg. § 1.701-2(b)."  Respondent omitted the word "federal" from the phrase "aggregate federal tax liability"

reproduced from section 1.701-2(b), Income Tax Regs. (anti-abuse regulation). Respondent conceded on the eve of trial that the anti-abuse regulation does not apply to these partnerships formed, in part, to reduce the investors' State tax liabilities.

The TMP timely filed petitions for readjustment of partnership items for the Virginia Historic Funds, and a lengthy trial was held.

OPINION

I. Introduction

We must decide whether the partnerships' allocations of State tax credits to the investors pursuant to State law must be treated as sales for Federal tax purposes. Respondent argues that the Virginia Historic Funds acted as a retailer between the developer partnerships and the investors and received $1.5 million[7] in gross income for the reselling of State tax credits. In doing so, respondent challenges the substance of the investors' participation in the partnerships using two alternative arguments. First respondent argues that the investors were not partners in the partnerships for Federal tax purposes and that the substance over form doctrine dictates that the investors purchased State tax credits rather than investing

_____

[7]Investors contributed a total of $6,995,332 to the Virginia Historic Funds, and the partnerships then contributed $5,131,702.58 to the developer partnerships. Respondent has allowed $330,986 in costs. Accordingly, respondent alleges a net partnership gain of $1,532,643.42, less other costs.

in a diverse group of developer partnerships to rehabilitate historic properties. Alternatively, respondent argues that the transactions between the investors and the partnerships were disguised sales under section 707. We disagree with both of respondent's arguments. Instead, we hold that the substance of the transactions matched their form.

We address each of respondent's alternative arguments in turn and then address the impact of the relevant limitations period. We begin with the burden of proof.

## II. Burden of Proof

The parties disagree whether the burden of proof shifted to respondent under section 7491(a). The Commissioner's determinations in an FPAA are generally presumed correct, and a party challenging an FPAA has the burden of proving that the Commissioner's determinations are in error. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933); Republic Plaza Props. Pship. v. Commissioner, 107 T.C. 94 (1996). The burden of proof shifts to the Commissioner under section 7491(a) with respect to a factual issue under certain circumstances. The burden shifts to the Commissioner if the taxpayer introduces credible evidence with respect to the issue and meets the other requirements of section 7491(a). Sec. 7491(a)(2)(A) and (B). We find that both parties have satisfied their respective burdens of production. A shift in the burden of persuasion "has real significance only in

the rare event of an evidentiary tie." Blodgett v. Commissioner, 394 F.3d 1030, 1039 (8th Cir. 2005), affg. T.C. Memo. 2003-212. We do not find that to be the case here. We therefore decide this case on the weight of the evidence.

III. The Investors Were Partners for Federal Tax Purposes

We now address whether the investors were partners in the Virginia Historic Funds for Federal tax purposes. Respondent admits that the Virginia Historic Funds were valid partnerships among the principals for Federal tax purposes and no longer argues that the partnerships should be disregarded under the anti-abuse regulation or the sham transaction doctrine.[8] Respondent argues, however, that the investors were not partners in these partnerships because the investors did not intend to join together for any business purpose other than the sale of State tax credits. Petitioner counters that the investors were partners who pooled capital to support a diverse group of developer partnerships and to share a net economic benefit from the resulting pool of State tax credits. We agree with petitioner after carefully considering the extensive evidence and

---

[8]The Court of Appeals for the Fourth Circuit requires that in order to treat a transaction as a sham a "court must find that the taxpayer was motivated by no business purposes other than obtaining tax benefits in entering the transaction, and that the transaction has no economic substance because no reasonable possibility of a profit exists." Rice's Toyota World, Inc. v. Commissioner, 752 F.2d 89, 91 (4th Cir. 1985), affg. in part and revg. in part 81 T.C. 184 (1983).

testimony presented, that the investors were partners for Federal tax purposes.

We turn now to the classification of partnerships. Federal law controls classification for Federal tax purposes though status under State law may be relevant. Estate of Kahn v. Commissioner, 499 F.2d 1186, 1189 (2d Cir. 1974), affg. Grober v. Commissioner, T.C. Memo. 1972-240; Luna v. Commissioner, 42 T.C. 1067, 1077 (1964); sec. 301.7701-1(a), Proced. & Admin. Regs. "Partnership" is broadly defined in the Code,[9] and Federal law recognizes as partnerships a broader range of multiple-party relationships than does State law. See secs. 761(a), 7701(a)(2); sec. 1.761-1, Income Tax Regs. A "partner" is a member in a "syndicate, group, pool, joint venture, or other unincorporated organization" that is classified as a partnership under Federal law. See sec. 7701(a)(2).

Respondent argues that the investors are not partners in these valid partnerships under the standards announced by the United States Supreme Court in Commissioner v. Culbertson, 337 U.S. 733, 742-743 (1949) and Commissioner v. Tower, 327 U.S. 280, 286 (1946). These decisions held that certain family partnerships were not partnerships for Federal tax purposes

---

[9]A partnership is defined as "a syndicate, group, pool, joint venture, or other unincorporated organization, through or by means of which any business, financial operation, or venture is carried on, and which is not, within the meaning of this title, a trust or estate or a corporation." Sec. 7701(a)(2).

because the partnership form was used to shift income earned by one family member to another family member.  See Commissioner v. Culbertson, supra at 742-743; Commissioner v. Tower, supra at 286.  This Court and others have relied on these cases where the Commissioner challenges a person's status as a partner for Federal tax purposes.  We will therefore address respondent's argument under these cases and their progeny.

A.    The Investors' Intent Under Culbertson and Tower

In general, a partnership exists when persons "join together their money, goods, labor, or skill for the purpose of carrying on a trade, profession, or business and when there is community of interest in the profits and losses."  Commissioner v. Tower, supra at 286.  The existence of the requisite purpose is a question of fact that ultimately depends on the parties' intent. Commissioner v. Culbertson, supra at 742-743; Commissioner v. Tower, supra at 287.  Thus, to determine whether a partnership exists, we consider whether, in light of all the facts, the parties intended to join together in good faith with a valid business purpose in the present conduct of an enterprise. Commissioner v. Culbertson, supra at 742; Allum v. Commissioner, T.C. Memo. 2005-177, affd. 231 Fed. Appx. 550 (9th Cir. 2007). We weigh several objective factors in an attempt to discern their true intent.  These factors include the agreement between the parties, the conduct of the parties in executing its provisions,

the parties' statements, the testimony of disinterested persons, the relationship of the parties, their respective abilities and capital contributions, the actual control of income and the purposes for which the income is used.  Commissioner v. Culbertson, supra at 742.  None of these factors alone is determinative, however.  Luna v. Commissioner, supra at 1077.  Accordingly, we weigh the objective factors to determine the investors' intent.

### 1.    The Agreement Between the Parties

The investors executed multiple documents, each of which reflects their intent to become partners in the Virginia Historic Funds.  Each investor signed both a partnership agreement and a subscription agreement.  Each document designated them partners.  These agreements reflect each individual investor's capital contribution, the percentage of the partnership owned, and the amount of State tax credits that would be allocated to the investor when the certificates were approved.  These agreements indicate the partnerships' purpose to help rehabilitate historic property and to receive State tax credits in return.  Each partnership agreement specifically provided that an investor would have an interest in the profits, losses, and net cash receipts of the partnership in proportion to his or her ownership interest.  Each partnership agreement also provided that assets remaining after satisfying the partnerships' liabilities shall be

distributed to the partners in accordance with positive balances in their respective capital accounts upon dissolution. These rights were enforceable under State law.

In addition, the investors were told that they must either individually own historic real property or partner with an entity that does to reap the benefit of State tax credits. The marketing materials the investors received described how their State encouraged its citizens to participate in the Virginia Program through the partnership form. They also received advice from accounting or investment firms that their involvement would be as partners. We do not ignore these facts. Most of the investors desired to support historic rehabilitation. All of them hoped to reap a net economic reward by using the credits while also limiting their risks in an appropriate manner. The Virginia Historic Funds offered the investors interests in an entity that was not only a partner in a diversified group of developer partnerships but was also managed by an expert on the Virginia Program. We therefore find that the agreements between the investors and the partnerships indicate that the investors intended to be partners.

2. Conduct of the Parties in Execution of the Agreement

The investors contributed capital to the partnerships upon execution of the partnership documents. The partners received Schedules K-1 from their respective partnerships allocating their

shares of credits from the partnership pool as well as their shares of other partnership items.  They applied the credits to their individual Virginia income tax liabilities for 2001.  In addition, the investors accepted checks pursuant to the option agreements in 2002 that liquidated their partnership interests after their respective partnerships met their purposes.  Further, the investors filed Federal tax returns for 2002 consistently reporting their partner status and the sale of their partnership interests under penalty of perjury.  These returns were consistent with the partnership returns and the Schedules K-1. All these facts indicate the general partner and investors intended to be partners and behaved as such.

The investors also had certain rights pursuant to the partnership agreements, subscription agreements, and option agreements that were enforceable under Virginia law.  Merely because they failed to exercise these rights did not negate these rights.  The investors' continued participation in the successor partnerships indicates that many of the investors' purposes in joining the partnerships were achieved.  We find that the conduct of the investors was consistent with their agreement with the partnerships.

### 3.  The Parties' Statements

Several investors testified at trial, and all of them confirmed that they were partners in the Virginia Historic Fund

in 2001. Respondent argues, however, that collectively the investors did not understand that their agreements with the partnerships made them partners. We cannot say whether the investors fully understood the legal relationship between partners in a partnership or whether they simply based their decision to participate in the partnerships on their accountants' advice and the descriptions of the partnerships that they provided. We find, however, that the investors' statements and conduct are consistent with their agreement to pool their capital with that of other investors both to facilitate the rehabilitation of historic structures, and to receive State tax credits under the Virginia Program. Specifically, the investors contributed significant capital to the partnerships, received net economic benefits for their participation, accepted checks in return for the purchase of their partnership interests, and reported both their partner status and the sale of their limited partnership interests on their individual Federal returns for 2002.

Respondent suggests that one partner's testimony that he thought he was making a charitable contribution for historic rehabilitation undermines the partners' collective intent. We find instead that it highlights the investors' dual intent to contribute to the preservation of Virginia structures and receive State tax incentives in return. In fact, most of the investors

who testified at trial discussed the "feel good" aspect of participating in the partnerships.

Finally, no investor has denied being a partner in the Virginia Historic Funds from the outset of this litigation eight years ago. We find this compelling given respondent's allegations that the partnerships failed to report $7 million for 2001 and 2002 and his many negative allegations concerning the principals. We find that the parties' representations during the years at issue and their testimony at trial support a finding that the investors intended to be partners.

### 4. Testimony of Disinterested Persons

Representatives of the accounting and investment firms testified they explained the Virginia Program and the use of the partnership form to their customers who subsequently became investors in the Virginia Historic Funds. These professionals often introduced the investors to the partnerships and were responsible for filing the investors' returns, which were all filed consistently with the investors as partners. These professionals were in the best position to know what role the investors played in the partnerships. We find compelling that there were no witnesses or testimony from investors to contradict the professionals' testimony. In addition, the director of the DHR and Mr. Leith-Tetrault, the president of the National Trust

Community Investment Corporation,[10] both testified that the investors were critical partners in the success of the developer partnerships and the Virginia Program. We find the testimony of disinterested witnesses to be in the partnerships' favor.

> 5. Relationship of the Parties and Their Respective Abilities and Capital Contributions

Respondent argues that the only relationship between the investors and the partnerships is that of buyer and seller. We find, however, that the parties intended to pool resources and share the results of investment. Each party contributed something of value. The investors contributed capital, while the principals contributed both capital and services. See Commissioner v. Tower, 327 U.S. at 287-288. The principals also initially bore the risk of loss associated with the costs of marketing the opportunity to invest in the Virginia Program through the Virginia Historic Funds. The investors relied upon the principals' expertise in the Virginia Program and the principals' selection of viable rehabilitation projects. The principals relied upon the investors' capital contributions and loyalty to make the rehabilitation projects viable. In summary, the partnerships were successful in rehabilitating a diversified group of structures primarily because the principals made good

---

[10]The National Trust Community Investment Corporation is a wholly owned subsidiary of the National Trust for Historic Preservation.

business decisions and the investors provided a large pool of capital.

Respondent also argues that the investors did not intend to be partners because they failed to share in the profits and losses of the partnerships. The partners were free to allocate the risks and rewards of partnership operation. The partnership agreements executed between the partnerships and the investors together created a shared economic interest in the profits and losses of the venture. See Commissioner v. Tower, 327 U.S. 280 (1946). The investors owned approximately a 1-percent interest in their respective partnerships and were entitled to 1 percent of the related profits and losses. Respondent cites no authority nor do we find any that an equal sharing of profit and loss is a prerequisite to the existence of a partnership. The principals informed the investors that the partnerships would generate negligible profits and losses. This is not surprising in the area of historic rehabilitation where tax credits are granted by both State and Federal governments to offset the industry's lack of profitability.

We find the relationship of the parties and their respective abilities a strong factor that the investors intended to become partners in the partnerships.

6. Control of Income and Purposes for Which It Was Used

Respondent determined that the partnerships collectively failed to report $7 million in partnership income. Respondent admits, however, that the amount at issue is actually the 19 cents per credit (19 cents) that the source partnership did not contribute to the developer partnerships. Respondent argues that the relationships between the investors and the partnerships must be disregarded because the source partnership kept that 19 cents rather than distributing it as profits. The 19 cents is profit only under respondent's credit-sale theory. The partnerships did not report the contributions as income or the 19 cents as profit to be distributed to their partners because they maintain that they did not sell credits to the investors. Mr. Gecker's conversations with Mr. Machen and other tax credit practitioners support this reporting position, especially given the lack of any guidance on the issue from the IRS. Instead, we find that the partnerships used this 19 cents to cover the partnerships' expenses and to protect against the various risks the partnerships faced. One investor stated that the 19 cents obviously reflected costs associated with the partnerships. After costs, anything left of the 19 cents remained in the source partnership or its successors until it was either used in a successor entity, distributed in part to the general partner, or exhausted during the course of this litigation. We consider this

factor neutral as the alleged partnership income exists only under respondent's credit-sale theory.

After examining all of the objective facts in the record, we find that the investors intended to become partners in the Virginia Historic Funds to pool their capital in a diversified group of developer partnerships for the purpose of earning State tax credits.

B.   The Partners Business Purpose and the Form of the Transactions

With this understanding of the investors' intent, we now turn to respondent's argument that even if the investors intended to be partners, the investors were not partners because they lacked a valid business purpose and the substance of the transactions did not match their form.  The form of a transaction will not be given effect where it has no business purpose and operates simply as a device to conceal the true character of a transaction.  See Gregory v. Helvering, 293 U.S. 465, 469-470 (1935).

1.   Business Purpose

We now turn to whether the pooling of capital for the purposes of supporting the developer partnerships and earning State tax credits is a valid business purpose.  Respondent argues that the investors' profit interests were illusory because they did not share in the partnerships' profits.  He further argues that the only economic value was in the investors' rights to

credits and the related State income tax savings. Respondent therefore argues that the investors' contributions lacked business purpose because they were not made in anticipation of receiving profits from the partnerships. We disagree.

First, there were no partnership profits except under respondent's credit-sale theory. We have found that the alleged partnership profits were contributions that remained in the source partnership to cover the costs and risks associated with the partnerships' operations. We therefore find that the 19 cents does not represent profits that were required to be distributed to the investors.

Second, each investor was entitled under the partnership agreements to a share of any profits generated by the partnerships had there been any. The parties agree, however, that the partnerships did not expect to make a profit in the literal sense, but instead offered a net economic gain to investors based on their reduced State income tax. Virginia enacted the Virginia Program, in large part, because investment in historic preservation generally would not otherwise be made due to low profitability. The investors understood that the same lack of profitability that required State legislative action would result in little to no profit to the developer partnerships and the Virginia Historic Funds. Their participation in the

Virginia Program despite this understanding should not, in itself, bar a finding of business purpose.

Third, the investors reaped a considerable net economic benefit from State income tax savings. Respondent cites several cases where courts have found that a partnership lacked business purpose because it did not have a nontax business purpose.[11] Respondent ignores, however, that in every case the taxes involved were Federal taxes. The omission of the word "Federal" from the anti-abuse regulation in the FPAA illustrates a critical distinction. The investors became partners in the Virginia Historic Funds to earn State tax credits to offset State income tax liabilities. State law provided for partnership allocations of State tax credits to increase funding for historic rehabilitation while creating minimal interference with the developers' allocations of Federal tax credits. The investors were not allocated Federal tax credits. The investors did not participate in the Virginia Historic Funds for a Federal tax benefit. Generally the investors experienced a Federal tax detriment, and any positive Federal tax consequences were incidental. The purpose of reducing non-Federal taxes has been recognized in the context of section 355 as a valid business

---

[11]Respondent cites Boca Investerings Pship. v. United States, 314 F.3d 625, 630 (D.C. Cir. 2003), ASA Investerings Pship. v. Commissioner, 201 F.3d 505, 513 (D.C. Cir. 2000), affg. T.C. Memo. 1998-305, and Saba Pship. v. Commissioner, T.C. Memo. 2003-31.

purpose as long as the reduction of non-Federal taxes is greater than the reduction of Federal taxes.[12]  See sec. 1.355-2(b)(2), Income Tax Regs.; T.D. 8238, 1989-1 C.B. 92, 93.  The parties agree that the investors' State tax savings far outweighed any incidental Federal tax savings.  In addition, the Commissioner has recognized that endeavors involving tax incentives should be held to a different profit-motive standard.  See Rev. Rul. 79-300, 1979-2 C.B. 112 (partnerships involved in low-income housing credits not subject to normal profit-motive standard under section 183).  Accordingly, we conclude that the investors had a business purpose for participating in a low-profitability venture because they expected a considerable net economic benefit from State tax savings and any Federal tax consequences were incidental.

### 2.  Substance Over Form Doctrine

We now address respondent's argument that the substance over form doctrine dictates that the investors purchased State tax credits rather than contributing capital to the partnerships as partners.  We examine the true nature of a transaction rather than mere formalisms, which exist solely to alter Federal tax

---

[12]A purpose of reducing non-Federal taxes is not a corporate business purpose if (i) the transaction will effect a reduction in both Federal and non-Federal taxes because of similarities between Federal tax law and the tax law of the other jurisdiction and (ii) the reduction of Federal taxes is greater than or substantially coextensive with the reduction of non-Federal taxes.  Sec. 1.355-2(b)(2), Income Tax Regs.

liabilities, to determine whether the substance over form
doctrine applies.  See Frank Lyon Co. v. United States, 435 U.S.
561, 572-573 (1978); Commissioner v. Court Holding Co., 324 U.S.
331, 334 (1945).  If the substance of a transaction accords with
its form, then the form will be upheld and given effect for
Federal tax purposes.

Respondent argues for the first time on brief that the
substance of the investors' contributions matches their form only
if the investors, through the Virginia Funds, were partners in
rehabilitation activity with the developer partnerships.[13]  Only
then, he contends, would the investors be treated as members in
the entity that originally qualified for the State tax credits.
Respondent's argument is misplaced.

As a general rule, we will not consider issues raised for
the first time on brief where surprise and prejudice are found to
exist.  See Sundstrand Corp. & Subs. v. Commissioner, 96 T.C.
226, 346-347 (1991); Seligman v. Commissioner, 84 T.C. 191, 198

---

[13]We have no jurisdiction to make a determination of whether
the investors were indirect partners in the developer
partnerships.  The determination of whether someone is a partner
is a partnership item when it affects the distributive shares of
the other partners.  See Blonien v. Commissioner, 118 T.C. 541
(2002).  Respondent did not issue FPAAs to the developer
partnerships.  Accordingly, the partners of the developer
partnerships have long been established as reported on the
partnerships' returns.  We therefore have no jurisdiction to
redetermine the investors' status as indirect partners in the
developer partnerships.  See Sente Inv. Club Pship. v.
Commissioner, 95 T.C. 243, 248 (1990).

(1985), affd. 796 F.2d 116 (5th Cir. 1986). Respondent determined in the FPAA that the investors were not partners in the Virginia Historic Funds. Throughout the lengthy discovery process and the trial on the merits, the parties' arguments focused on whether the investors were partners in these partnerships. We find that respondent's attempt to change the focus to the developer partnerships creates surprise and prejudice to the partnerships.

We now turn to the substance of the transactions between the investors and the Virginia Historic Funds. The Supreme Court has held that we should honor the parties' relationships where there is a genuine multiple-party transaction with economic substance that is compelled or encouraged by regulatory or business realities, is imbued with Federal tax-independent considerations, and is not shaped solely by Federal tax avoidance. See Frank Lyon Co. v. United States, supra at 583-584; Estate of Hicks v. Commissioner, T.C. Memo. 2007-182. Congress encourages State historic rehabilitation programs and supports individuals involved in these programs. National Historic Preservation Act of 1966, as amended 16 U.S.C. sec. 470-1. The Virginia Program's base-broadening allocation provision encourages capital contributions to cover the credit gap between cost and available financing. This allocation provision allows State investors to contribute capital to historic rehabilitation projects without

interfering with the allocations of Federal tax credits.  The

investors became partners in the Virginia Historic Funds because

they were required to join an entity to participate in the

Virginia Program, which does not provide for freely transferable

credits.  Further, the tiered structure of the partnerships was

not undertaken for Federal tax avoidance reasons.  Developer

testimony established that the developer partnerships were not

equipped to deal with hundreds of partners at the developer-

partnership level.  Instead, the developer partnerships benefited

from working with the principals, who were knowledgeable about

historic rehabilitation and the Virginia Program.  The investors

also benefited by having the principals choose successful

rehabilitation projects.  Further, the investors' partnership

interests created rights and responsibilities between the parties

under State law and allowed the investors to participate in the

risks and rewards of the partnerships.  We find that the form of

the transactions was not a mere formality undertaken for purposes

of Federal tax avoidance.  Instead, this form was compelled by

realities of public policy programs, generally, and the Virginia

Program, specifically.

Respondent ignores these realities and argues that the

amounts of the contributions, the timing of the transactions, and

the investors' lack of risk suggest that the transactions were in

substance sales.  Respondent argues that the entire amount of an

investor's contribution went to the purchase of his or her allocated State tax credits. We find instead that the contributions were pooled to facilitate investment in the developer partnerships, to purchase additional credits under the one-time transfer provision to meet the needs of the partnerships, to cover the expenses of the partnerships, to insure against the risks of the partnerships, and to provide capital for successor entities in which many of the investors participated year after year and for other rehabilitation projects. These pooled capital contributions were critical to the success of both the Virginia Historic Funds and the developer partnerships.

Respondent also argues that the timing of the contributions, the allocations, and the investors' departure from the partnerships suggest that the transactions are sales. Again we disagree. The parties have stipulated that the investors remained in the partnerships until after the partnerships had fulfilled their purpose. Their capital contributions funded the developer partnerships, the developer partnerships completed the projects and received certification from the DHR, and the State tax credits were allocated to the investors. The capital contributions were generally made late in 2001. The contributions then belonged to the partnerships. The State tax credits were allocated to the partners on the Schedules K-1 on

April 15, 2002. In addition, the capital contributions were not made in exchange for credits that had already been allocated to the partnerships. Instead, the pooled capital contributions made it possible for the partnerships to contribute capital to the developer partnerships and to purchase credits under the one-time transfer provision.

Respondent further argues that the investors bore no risk because the Virginia Historic Funds attempted to limit those risks in its agreements with the developer partnerships and the investors. Again, we disagree. We find that the investors bore sufficient risk. The investors bore risks associated with the partnerships' public incentive nature as well as the general risks faced by partners in most partnerships. For example, the partners faced the risk that developers would not complete their projects on time because of construction, zoning, or management issues. They also faced the risk that the DHR would not be satisfied with the rehabilitation and the developers would not receive the credits. Finally, they faced the risk that the DHR would revoke the credits and recapture them in later years. Accordingly, the partners risked their anticipated net economic benefit. The investors received assurance that their contributions would be refunded if, and only if, the anticipated credits could not be had or were revoked. There was no guarantee, however, that the resources would remain available in

the source partnership to do so.  Further, the investors were unlikely to recover against the principals if those resources were exhausted.  The general partner is a limited liability company whose members are not personally liable for the debts or actions of the entity.  See Hagan v. Adams Prop. Associates, 482 S.E.2d 805 (Va. 1997); see also Gowin v. Granite Depot, LLC, 634 S.E.2d 714 (Va. 2006).

The investors also faced risks from the partnerships' ownership interests in the developer partnerships.  These risks ranged from liability for improper construction to the risk of mismanagement or fraud at the developer partnership level.  The developer partnerships faced continuing duties as a consequence of receiving the credits.  The Virginia Historic Funds obtained many of the State tax credits granted to these partnerships, and any threatened revocation of the credits could have created additional expenses to be borne by the Funds as the developer partnerships might not have been willing to perform the duties necessary to maintain the credits.  Further, the investors faced the risks of fraud by another investor, retroactive changes in the law, and litigation in general.  Any of these risks threatened the partnerships' pooled capital and ability to fulfill their purpose.

Limited partners, by definition, are protected from many partnership risks under State law.  Partnerships may find further

assurances necessary to attract limited partners. These assurances do not necessarily erase entrepreneurial risk entirely. Sharing, managing, and even insuring against capital risks often simply reflect good business practices. It is important that the investors shared their risks with one another. For example, the investors shared the risk of losing their expected net economic gain. Had one project failed, the partners would have shared in the shortage pro rata. The investors also shared the risks of an inadequate pool of State tax credits and the possibility of the credits being retroactively revoked. This shared risk sets the investors apart from simple purchasers.

Considering all the facts and circumstances, we conclude that the investors intended to join together in the Virginia Historic Funds as partners to participate in the enterprise of pooling their capital to invest in developer partnerships and receive State tax credits in return. We further conclude that their participation in the partnerships had a valid business purpose. Finally, we conclude that the form of the investors' contributions to the partnerships and the resulting allocations of credits reflect their substance. Accordingly, we hold that the investors were partners in the Virginia Historic Funds for Federal tax purposes.

IV.   Disguised Sales Under Section 707

We have examined the substance of the investors'
participation in the Virginia Historic Funds and held that the
investors were partners in those funds for Federal tax purposes.
We must now address respondent's alternative argument that the
investors' capital contributions to the partnerships coupled with
the allocations of State tax credits were disguised sales under
section 707(a)(2)(B).  Respondent argues that these transactions
were disguised sales between the partnerships and their
respective partners.  We disagree.

A transaction is treated as a disguised sale between a
partner and a partnership when the partner transfers money or
other property to the partnership, the partnership transfers
money or other property[14] to such partner in return, and these
transfers when viewed together are properly characterized as a
sale.  See sec. 707(a)(2)(B).  Such transactions are presumed
sales when they occur within two years of one another.  See sec.
1.707-3(c)(1), Income Tax Regs.  In all cases, however, the
substance of the transaction will govern rather than its form.
Sec. 1.707-1(a), Income Tax Regs.  Therefore, transfers of money
or property by a partner to a partnership as contributions, or
transfers of money or property by a partnership to a partner as

---

[14]We specifically do not address whether the State tax
credits are property for purposes of sec. 707 as it is not
essential to our holding.

distributions, are not transactions included within the provisions of section 707(a).  Id.

We have found that the investors made capital contributions to the Virginia Historic Funds in furtherance of their purpose to invest in developer partnerships involved in historic rehabilitations and to receive State tax credits.  We have further found that the partnerships were able to participate in the developer partnerships because of the investors' pooled capital.  Finally, we found that the partnerships allocated the resulting pooled credits to the investors as agreed in the partnership and subscription agreements consistent with the allocation provisions of the Virginia Program.  The substance of these transactions reflects valid contributions and allocations rather than sales.

In addition, there is no disguised sale when the transactions are not simultaneous and the subsequent transfer is subject to the entrepreneurial risks of the partnership's operations.  See sec. 1.707-3(b)(1), Income Tax Regs.  The investors contributed capital at various times during the years at issue.  The State tax credits were allocated to the partners when the partnerships attached the certificates to their respective Schedules K-1.[15]  We therefore find that the transfers

---

[15]The State tax credits remained inchoate until an individual investor used them to reduce his or her State income
(continued...)

were not simultaneous.  The investors were promised certain amounts of credits in the subscription agreements, but there was no guarantee that the partnerships would pool sufficient credits. This risk, as well as the other risks addressed in our discussion of business purpose, represent the risks of the enterprise. Accordingly, we conclude that the transactions are not disguised sales.  We further hold that the partnerships did not have $7 million in unreported income from these transactions in either of the years at issue.

V.   Adjustments Barred by the Statute of Limitations

We now turn to whether the adjustments in the FPAA are time barred under the statute of limitations.  The Code does not provide a period of limitations within which an FPAA must be issued.  See Curr-Spec Partners, L.P. v. Commissioner, 579 F.3d 391 (5th Cir. 2009), affg. T.C. Memo. 2007-289; Rhone-Poulenc Surfactants & Specialties, L.P. v. Commissioner, 114 T.C. 533, 534-535 (2000).  Any partnership item adjustments made in an FPAA will be time barred at the partner level if the Commissioner does not issue the FPAA within the applicable period of limitations for assessing tax attributable to partnership items.  Curr-Spec Partners, L.P. v. Commissioner, supra at 398-399; Rhone-Poulenc Surfactants & Specialties, L.P. v. Commissioner, supra at 535.

---

[15](...continued)
tax liability in 2001 or later years.

The limitations period is generally three years for the assessment of tax attributable to a partnership item.[16]  Sec. 6229(a).  This limitations period remains open at least for three years after the date the partnership return was filed or three years after the last day, disregarding extensions, for filing the partnership return, whichever is later.  Id.  The limitations period is extended to six years if a partnership improperly omits an amount from gross income that exceeds 25 percent of the gross income reported on its return.  Sec. 6229(c)(2).

The parties agree that the determinations in the FPAA are barred for 2001 under the 3-year limitations period.  Respondent argues, however, that the 6-year limitations period under section 6229(c)(2) applies because the partnerships omitted at least 25 percent of gross income from their partnership returns.  We disagree because we have found that the partnerships properly reported the flow-through allocation of the State tax credits to the investors as partners.  Further, the capital contributions were not proceeds from the sale of State tax credits.  By definition, therefore, the partnerships did not recognize unreported income from the sale of State tax credits in 2001.  We therefore conclude that the 6-year limitations period does not apply and respondent is barred from adjusting the Virginia

---

[16]Respondent does not argue that there is a partner or investor for whom the limitations period of sec. 6501 remains open.

Historic Funds' partnership items for 2001 or assessing tax attributable to these partnership items at the individual partner level.[17]

VI. <u>Conclusion</u>

In summary, we have found that the investors were partners in the Virginia Historic Funds for Federal tax purposes in 2001, that their transactions with the partnerships were not sales of State tax credits under the substance over form doctrine or under section 707, and that the statute of limitations bars the adjustments in the FPAAs for 2001 and any assessment of tax related to the partnership items at the partner level. In reaching these holdings, we have considered all arguments made, and, to the extent not mentioned, we conclude that they are moot, irrelevant, or without merit.

To reflect the foregoing and the concessions of the parties,

<u>Decisions will be entered
for petitioner</u>.

---

[17]The partnerships extended the limitations period for 2002.